ROBERT T. MOSELEY *et al.*, Petitioners-Appellants, *v.* JEANNETTE GOLDSTONE, Respondent-Appellee.

First District (2nd Division)    No. 80-1520

Opinion filed October 7, 1980.

Robert T. Moseley and Rebecca E. Moseley, both of Chicago, for appellants, *pro se.*

Beermann, Swerdlove, Woloshin, Barezky & Berkson, of Chicago (Miles N. Beermann, of counsel), for appellee.

Mr. JUSTICE HARTMAN delivered the opinion of the court:

This case presents the somewhat bizarre circumstances of a natural mother and putative father being deprived of custody of their four

children by virtue of a series of court orders entered in the States of Florida and Illinois which initially gave to and thereafter continued custody of the children with the maternal grandparents. The mother, and her husband, whose parental relationship to the children was questioned by the grandparents, appear to have married in March or April of 1978, although the oldest of the four children was born in 1966 and the youngest in 1973. The appeal is taken from an order dismissing the petition of the mother and her husband filed in Illinois, which sought custody based upon an alleged change of circumstances, and from an order denying vacatur of the dismissal order.

The mother and her husband raise as issues the denial of their rights of visitation; the applicability to their situation of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1979, ch. 40, pars. 601, 610) (Marriage Act); and the propriety of the order denying their motion to vacate the dismissal order after they sought to comply with court orders and the statute. For reasons hereinafter set forth we reverse and remand for further proceedings.

The verified petition filed by the mother, Rebecca E., and the husband, Robert T. Moseley ("mother and husband" or "petitioners"), on June 6, 1979, invoked the jurisdiction of the circuit court of Cook County under section 601 of the Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 601). It alleged that in February 1978, Rebecca took their four children on a planned visit with the mother's parents,· Norval (who since died) and Jeannette Goldstone ("grandparents") then living in Florida. Thereafter, Robert flew to Florida, spent a few days there with the mother, and returned with her to Chicago, leaving the children with the grandparents and intending to return and pick them up in two weeks. Before the two weeks elapsed, the petition states, the school-aged children were enrolled in Florida schools. Petitioners went back to Florida and subsequently assented to allowing the children to remain there until completion of the spring school term.

In March 1978, according to the petition, the grandparents initiated an action in Florida seeking custody of the children. In April 1978, petitioners retained Florida counsel and traveled there to oppose the action and retrieve the children. The Florida court entered temporary custody orders and directed the investigation of the respective environmental situations of the mother and husband, and of the grandparents, in making a determination of which home would serve the best interests of the children. It also directed that petitioners submit to psychiatric examinations pursuant to further order of court. No subsequent order on either subject appears to have been entered. Not mentioned in the petition was the filing by the mother and husband in Florida of a response and counterpetition for a writ of habeas corpus seeking custody of the

children, which was denied on May 2, 1978, an exemplified copy of which is attached to appellee's brief.

Meanwhile, during the summer of 1978, the petition asserts, the grandparents returned to the Chicago area with the children and petitioners filed an action in the circuit court of Cook County for a writ of habeas corpus, which was denied on August 7, 1978, setting forth as grounds that there was a prior custody proceeding pending in the State of Florida and that the local court was without jurisdiction to grant the relief sought. Thereafter, the grandparents returned to Florida with the children and refused to allow any communication to take place between the latter and petitioners. The grandparents filed a motion for summary judgment, which alluded to "* * * testimony adduced at the temporary hearing and the report of the Division of Family Services all show[ing] that the best interest of the minor children will be served by being placed in the * * * [grandparents'] custody." No transcript of testimony or report was attached to the motion. On February 13, 1979, an order was entered by the Florida court awarding to the grandparents "* * * the permanent care, custody and control of the minor children," and permitting the grandparents to remove the children from the jurisdiction of the Florida court subject to further orders. The order noted that counsel for the mother and husband had represented to the court that they would not appear for a final hearing in the cause. In February 1979, the grandparents left Florida and returned permanently to the Chicago area with the children, who were thereafter enrolled in local schools.

The petition alleged that since the February 1979 Florida ruling there had been a substantial change in circumstances involving the grandparents' illnesses and that the present environment of the children seriously endangered their physical, mental, moral and emotional health. No affidavits accompanied the petition. A motion to strike and dismiss the petition filed by the grandparents was denied, and they were given leave to respond, which they did on June 28, 1979. The verified response denied that Robert was the father of the children and disputed the authenticity of the birth certificates attached to the petition as exhibits, claiming that they were reregistrations and that the children were actually fathered by a different person. The response questioned the Cook County court's jurisdiction of the petition in view of the Florida proceedings and by reason of the provisions of section 610 of the Marriage Act. Ill. Rev. Stat. 1979, ch. 40, par. 610.

The grandparents' response alleged further that in January 1978 the eldest child, a female, ran away from the home in which she resided with the mother and husband. This action was precipitated by certain alleged misconduct by the husband toward her, as reported to police some two years prior to January 1978, and another incident which occurred just

prior to the time she ran away. We deem it unnecessary and inappropriate to memorialize in this opinion the specific allegations made. She refused to return home and was taken to the home of one of the mother's sisters. During the night, the mother called the grandparents, said that she was in fear of her life and wanted to come to Florida with the children, which they did that night. Two weeks later Robert came to Florida. Without anything being said, the response asserts, the mother departed Florida with Robert and abandoned the children to the grandparents.

The response further maintains that the grandparents enrolled the children in school in February 1978 because they received no word from the mother concerning their future. In March 1978, the mother, claiming that she was leaving Robert, came to Florida with one of her sisters. Two weeks later Robert again appeared in Florida and took the mother back to Chicago with him, again abandoning the children to the grandparents. The grandparents several weeks later received a letter from the mother and Robert stating that they had gotten married in Georgia in the interim. Because of the antecedent events, the grandparents applied to the Florida court for custody of the children. The response denied any change in circumstances except for the fact that the children were now present in Illinois and that the mother and her husband were not fit and proper to have custody of the children by virtue of the mother's condonation of the unnatural acts of her husband towards the oldest child and the fact that the husband had inflicted on the children severe physical abuse including beatings with a rubber or vinyl hose from which the oldest child still bore scars.

The Illinois hearings on the petition began on June 28, 1979. The eldest child was interviewed in chambers by the court in the presence of a court reporter and attorneys for both sides. That examination was undertaken for the purpose of determining whether visitation by petitioners of the children should have been allowed as temporary relief. The 13-year-old girl testified that she did not want to see her mother and father because her "* * *mother has hurt her too many times * * *." She then testified about the improper conduct of the husband toward her, which was the same conduct set forth in the grandparents' response, to which we have alluded in the paragraph previous to the one preceding this one. Thereafter, the court directed that an investigation be undertaken by the Department of Supportive Services of the homes of petitioners and of the grandparents. No report of the results of such an investigation appears in the record, nor do the parties refer to any such report. The mother and husband were prohibited from communication with or attempting to see the children until further order of court.

A series of motions followed, seeking to vacate earlier orders and for

temporary custody or visitation, without disposition until January 21, 1980. On that date the trial court denied motions to vacate prior orders of temporary custody and other relief, in consideration of the petition, motions and response, as well as arguments of counsel and of the mother and husband, now appearing *pro se.* On February 8, 1980, the court directed, among other things, that the mother, only, be allowed to visit with the children at the present place of residence each Sunday, but denied to the husband any rights of visitation. The cause was continued until ultimately assigned to another judge for trial.

On March 25, 1980, the new court found that the mother and husband's petition for permanent custody was insufficient because it failed to include affidavits in support thereof as required by section 610(a) of the Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 610(a)) and directed that the petition be dismissed unless such affidavits were filed before April 21, 1980. It was petitioners' contention *pro se* that affidavits were not required by section 610(a), and on April 21 they filed motions for a continuance and for a change of venue based upon their understanding of the law. On April 25, 1980, these motions were denied and the permanent custody petition dismissed with prejudice for failure to comply with orders of court and with section 610(a). On May 22, 1980, petitioners filed a motion to vacate the dismissal to which were attached two affidavits in an effort to comply with the court's previous orders and to bring their petition within the requirements of section 610(a). That motion was denied, the trial court observing that petitioners had been given a "substantial length of time to file these affidavits * * * [but that they] have refused to comply." The trial court found no basis upon which it was authorized to vacate the previous order of dismissal.

Petitioners appeal only from the dismissal order of April 25 and the vacatur denial of May 22, 1980, and appear here *pro se.*

I.

■■ Petitioners contend first that the order denying them visitation with their children was an abuse of discretion under the visitation provisions of section 607 of the Marriage Act in view of the posture of the pleadings and evidence submitted in both the Florida and Illinois courts. This argument concerns orders to which no reference is made in their notice of appeal, namely, the order of June 28, 1979, later confirmed by the orders of January 21 and February 8, 1980, and cannot be considered (Ill. Rev. Stat. 1979, ch. 110A, par. 303(c)(2); *Mooring v. Village of Glen Ellyn* (1978), 57 Ill. App. 3d 329, 373 N.E.2d 35). Further, the issue of visitation during the pendency of the action is moot because nothing can be done to remedy the denial of visitation for a time period which has already passed;

consequently, no useful purpose can be served in considering the denial of the specific visitation requests. *Klitzing v. Gottemoller* (1979), 76 Ill. App. 3d 783, 787, 395 N.E.2d 193.

## II.

Of greater significance is the second issue raised by the appeal in which it is contended that the trial court erred in requiring the filing of affidavits to conform to section 610(a) of the Marriage Act, and in failing to accept the affidavits when subsequently submitted together with the motion to vacate the dismissal of the petition. It is argued inferentially in the brief and explicitly in oral argument that section 610(a) applies only when orders of custody are entered by a trial court in those instances where the parents are before the court in actions for dissolution of marriage. Here, the mother and husband maintain, since they are now married and were never divorced, the Marriage Act is wholly inapplicable to the present circumstances, reasoning that if that act does not apply, the provision requiring the affidavits to be filed in support of their petition for change of custody is superfluous and the trial court's insistence upon their being filed upon pain of dismissal was error.

Although not officially enrolled with the clerk of the circuit court of Cook County as provided in section 16 of the Illinois Uniform Child Custody Jurisdiction Act (Ill. Rev. Stat. 1979, ch. 40, par. 2116) (Illinois Custody Act), certain pleadings filed and apparently entertained by the Florida court were attached to the mother and husband's verified petition for temporary and permanent custody of the children. Also, exemplified copies of those and other documents and orders are contained in an appendix to the appellee's brief. These documents and orders should have been filed as provided by statute; nevertheless, as an aid to understanding the posture of this case, they will be referred to and considered as necessary. See *In re Sharp* (1978), 65 Ill. App. 3d 934, 945, 382 N.E.2d 1279.

Before referring to those documents and orders, however, we note that the provisions of subsections 3(a) through (c) of the model Uniform Child Custody Jurisdiction Act of 1968 are substantially adopted in section 61.1308 of the Florida Uniform Child Custody Jurisdiction Act (Fla. Stat., 1980 Supp., §61.1308) ("Florida Custody Act"), as they are in section 4 of the Illinois Custody Act (Ill. Rev. Stat. 1979, ch. 40, par. 2104). Section 61.1308(1)(c)(1) confers on any Florida court which is competent to decide child custody matters, jurisdiction to make child custody determinations by initial or modification decrees if, among other things, "(c) the child is physically present in this state and: 1. the child has been abandoned * * *." These Florida provisions are substantially the same as subsection 4(a)3(i) of the Illinois Custody Act (Ill. Rev. Stat. 1979, ch. 40,

par. 2104(a)3(i)). Pending divorce or separation of parents thus are not prerequisites of jurisdiction of the court under either the Florida or the Illinois custody acts when certain enumerated circumstances exist. The grandparents' petition for custody and other relief filed in Florida reveals an effort to track section 61.1308(1)(c)1 of the Florida Custody Act, although it does not designate any statutory provisions upon which it proceeded. That verified pleading asserted that the four children were located physically within the State of Florida and that they were not in the physical custody of petitioners who "* * * voluntarily surrendered care, custody and control of the children * * *" to the grandparents. Whether such acts rise to an "abandonment," defined in Illinois as conduct on the part of parents demonstrating a settled purpose to forego all parental duties and claims to a child (*In re Petition to Adopt Cech* (1972), 8 Ill. App. 3d 642, 644, 291 N.E.2d 21; *In re Adoption of Smith* (1976), 38 Ill. App. 3d 217, 228, 347 N.E.2d 292), in light of petitioners' continuing efforts to re-establish custody, is problematical. Nevertheless, jurisdiction was, at the least, superficially established under the terms of the Florida Custody Act.

■■ By its express terms, section 601(a) of the Illinois Marriage Act specifically extends to the courts of this State jurisdiction to decide child custody matters, in original or modification proceedings "* * * as provided in Section 4 of the Uniform Child Custody Jurisdiction Act * * *" (Ill. Rev. Stat. 1979, ch. 40, par. 601(a)). It is not entirely clear that the statement of purpose of the Illinois Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 102) contemplates a custody action unrelated to marriage or its dissolution, as contained in the broad terms of section 601 (Ill. Rev. Stat. 1979, ch. 40, par. 601). The Illinois Custody Act (Ill. Rev. Stat. 1979, ch. 40, par. 2101 *et seq.*), which appears concerned primarily with the ramifications of conflicts of laws in custody matters, merely sets forth jurisdictional bases without specific standards or procedures as are to be found in the Illinois Marriage Act (*e.g.*, Ill. Rev. Stat. 1979, ch. 40, par. 602), and seems to anticipate the utilization of such standards once jurisdiction has been established. Because of the similarity of the provisions of the Florida and Illinois custody acts aforesaid, and the explicit authority given to the circuit court to exercise under section 601 of the Illinois Marriage Act the same jurisdiction it could exercise under section 4 of the Illinois Custody Act, we find that the circuit court of Cook County properly assumed jurisdiction of the modification petition brought before it in this case.

Arguably, resort could have been had in either Florida or Illinois to the more traditional and stringent Juvenile Court procedures (see Commissioners' Note, section 401, Marriage and Divorce Act, 9A Uniform Laws Annotated 194 (1979)); however, the absence of the State's presence

in the Florida proceedings, or of any request that the children be made wards of the court, or of any remedy seeking the establishment of a guardianship relationship (see Fla. Stat., 1980 Supp., §§39.404, 39.41), further supports the inference that the Florida court apparently based its authority upon the Florida Custody Act provisions aforesaid. In addition, the action initiated by petitioners in Illinois while represented by counsel, invoking section 601 of the Illinois Marriage Act as their jurisdictional basis for the proceeding, which by its terms specifically grants the same jurisdictional authority to a court making a child-custody determination under section 601 of the Marriage Act as it would have under section 4 of the Illinois Custody Act, buttresses the inference that the Florida Custody Act was understood by the parties to have been the authority for the Florida court orders of custody.

The Illinois Custody Act requires that courts of this State recognize and enforce an initial custody judgment of a court of another State, or a modification thereof, which had assumed jurisdiction under statutory provisions substantially in accordance with the provisions of the Illinois Custody Act (Ill. Rev. Stat. 1979, ch. 40, par. 2114), just as the Illinois Custody Act requires that its custody judgments be considered conclusive "* * * unless and until that determination is modified pursuant to law, including the provisions of this [Illinois] Act" (Ill. Rev. Stat. 1979, ch. 40, par. 2113). The Florida Custody Act contains similar provisions (Fla. Stat. 1980 Supp., §§61.1328, 61.133), which we are equally obligated to follow. See also *Light v. Light* (1957), 12 Ill. 2d 502, 510-11, 147 N.E.2d 34.

■■ Section 610(a) of the Marriage Act provides that "no motion to modify a custody judgment may be made earlier than 2 years after its date, unless the court permits it to be made on the basis of affidavits that there is reason to believe the child's present environment may endanger seriously his physical, mental, moral or emotional health" (Ill. Rev. Stat. 1979, ch. 40, par. 610(a)); however, nothing within the Illinois Custody Act requires the filing of affidavits in support of a modification of custody petition. Reference to section 610(a) by the trial court could have been properly made in deference to State policy, rather than as a statutory prerequisite. Such an approach would have tended to maximize the desirable finality of the custody determination in furtherance of State policy that the best interests of children are served by fostering continuity of relationships and surroundings and by discouraging unnecessary change. (*In re Custody of Harne* (1979), 77 Ill. 2d 414, 420, 396 N.E.2d 499; *In re Custody of Nodot* (1980), 81 Ill. App. 3d 883, 889-90, 401 N.E.2d 1189.) The trial court's insistence that affidavits be filed under these circumstances would have provided an aid to the court in making its determination. Petitioners' failure to comply with the court's directive

properly subjected the petition to the dismissal order entered on April 25, 1980.

## III.

■■ The refusal of the trial court to consider the requisite affidavits on their merits once they were presented by petitioners in their motion to vacate the April 25, 1980, order, however, presents a different question. The trial court had before it the sensitive balancing of traditional parental rights to custody of their offspring (Ill. Rev. Stat. 1979, ch. 110½, par. 11—7), against the best interests of those children in the unusual circumstances presented. Such a balancing cannot be perfunctorily decided. The importance of maintaining the family as a unit has long been considered central to the vitality of our societal fabric, and is indeed recognized by statute (Ill. Rev. Stat. 1979, ch. 37, par. 701—2(1)). The United States Supreme Court has held that the parental rights to custody of their children are constitutionally protected in *Stanley v. Illinois* (1972), 405 U.S. 645, 651, 31 L. Ed. 2d 551, 558, 92 S. Ct. 1208, 1212-13, observing:

> "The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed 'essential,' *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923), 'basic civil rights of man,' *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942), and '[r]ights far more precious . . . than property rights,' *May v. Anderson*, 345 U.S. 528, 533 (1953). 'It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944). The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, *Meyer v. Nebraska, supra*, at 399, the Equal Protection Clause of the Fourteenth Amendment, *Skinner v. Oklahoma, supra*, at 541, and the Ninth Amendment, *Griswold v. Connecticut*, 381 U.S. 479, 496 (1965) (Goldberg, J., concurring)."

Those rights must give way, however, where, as in this case, it is shown that custody by the natural parents is seriously challenged as being detrimental to the welfare of the children; and, when their custody has been entrusted to others, a significant change in their circumstances must trigger a re-examination of that situation as well.

The linchpin in guardianship and child custody cases is the best interests of children, whether brought under the Juvenile Court Act (Ill. Rev. Stat. 1979, ch. 37, par. 701—2(1)), under the Marriage Act (Ill. Rev. Stat. 1979, ch. 40, pars. 602, 610(b)), or under the Custody Act (Ill. Rev. Stat. 1979, ch. 40, par. 2104(a)2). Petitioners' affidavits contain allegations

which, if true, raise serious questions with respect to whether custody should be continued by the surviving grandparent. For example, it is alleged that the present custodian of the four children is aged 72, is chronically ill and cannot walk without the aid of others helping her, is confined to a wheelchair and has complained of suffering from chronic arthritis, kidney problems and heart problems, among others. It is further alleged that she is physically unable to prepare meals for the children or attend to their everyday needs, which seriously endangers their physical well being. The foregoing allegations, among others, should have been considered by the trial court and a hearing held thereon before refusing to vacate the dismissal of the petition which previously lacked the necessary evidentiary allegations now contained within the late-filed affidavits.

■■ It is entirely understandable that when a trial court directs affidavits to be filed and a party contumaciously refuses to do so, although given sufficient opportunity to comply, reason may exist to deny a motion to vacate a resultant order of dismissal. (See, *e.g., In re Estate of Fado* (1976), 43 Ill. App. 3d 759, 357 N.E.2d 195.) Here, however, because the welfare of the children is of cardinal and overriding importance in these proceedings, the affidavits purporting to present what may well be a substantial change of circumstances which endangered seriously their physical, mental, moral or emotional health constituted a veritable judicial red flag. The discretion exercised by the trial court in this instance should have favored a consideration of the affidavits on their merits. Fundamental justice insofar as the children's welfare and best interests are concerned demands no less. (*Anderson v. Anderson* (1975), 28 Ill. App. 3d 1029, 1034, 329 N.E.2d 523.) Refusal to do so requires reversal of the order denying vacatur of the dismissal of the petition.

It is not suggested by the view we take that the trial court is bound upon remand of this case either to remove custody from the custodial grandparent or, if that step should become necessary in the best interests of the children, that they necessarily be placed with petitioners. These and other considerations will no doubt emerge from the full and expedited hearing which we contemplate this disposition will generate.

Reversed and remanded.

PERLIN, P. J., and DOWNING, J., concur.